## IN THE UNITED STATES DISTRICT COURT
## FOR TH EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Joel V. Dennis Lee,

Case No.

*Plaintiff*,

Hon.

v.

The City of Flint Michigan, a municipal corporation,
Former Emergency Manager, Edward Kurtz,
Individually and in his official capacity,
Former Emergency Manager Darnell Earley,
Individually and in his official capacity,
Former Emergency Manager, Gerald Ambrose,
Individually and in his official capacity,
Lockwood, Andrews & Newnam, P.C.,
Lockwood, Andrews & Newnam Inc.,
Leo A. Daily Company, Veolia North America, LLC,
Veolia North America, Inc.;
Veolia Water North America Operating Services, LLC;
Veolia Environment S.A.; Rowe Professional Services Company
d/b/a Rowe Engineering Inc., a/k/a Rowe, LLC;

*Defendants*.

There is a related case filed under docket number 17-cv-10343 recently re-assigned to the Honorable Judith E. Levy and Magistrate Judge Mona K. Majzoub in Ann Arbor

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

**NOW COMES**, the above-named Plaintiff, by and through his Attorney of

Record, Valdemar L. Washington, and brings this action for damages to his person,

and demands trial by jury. Unless stated otherwise, all allegations contained herein

are made on information and belief. In support of his claim Plaintiff alleges as follows:

## <u>NATURE OF THE CASE</u>

1.   Joel V. Dennis Lee, (hereinafter "Plaintiff") is a resident of Saginaw County, who was exposed to Legionella bacteria as a result of working in the Flint as a Schwann's delivery person. During the last week of November 2016 or first week of December 2016, Plaintiff contracted Legionella or Legionnaires Disease on or about December 6, 2016. As a result of his exposure to the Legionella bacteria, Plaintiff was hospitalized between December 6, 2016 and December 11, 2016 and was confined to his home requiring oxygen for an additional two weeks. Plaintiff suffered permanent injury to his pulmonary system as a result of contracting Legionnaires disease in December 2016.

2.   Between December 1, 2011 and April 30, 2015, the City of Flint (hereinafter "City") was in a state of financial emergency pursuant to either P.A. 4, of 2011 or P.A. 436 of 2012, and under the control of a Governor-appointed Emergency Manager.  On April 25, 2014, in an effort to save money, the former Emergency Manager Darnell Earley (hereinafter "Earley") authorized a switch to the Flint River from the Detroit Water and Sewer

Department (hereinafter "DWSD") as the City's sole water source of the City's fresh drinking water.

3.  The City, as the owner of the Flint Water Treatment Plant (hereinafter "WTP") had a legal duty to repair and maintain its public buildings under its control, which were open for use by members of the public. In particular, City and Earley had actual or constructive knowledge of the danger to the public in general and Plaintiff in particular of distributing contaminated/corrosive water from its Water Treatment Plant, through the aged water distribution system/infrastructure, and failed to install the necessary equipment in the WTP for the safe processing of Flint River water. The City's negligent operation of its Water Treatment Plant existed for a continuous period, which started on April 25, 2014 and continued at least through December 6, 2016, as far as this plaintiff is concerned.

4.  The City or its Emergency Managers hired engineering Defendants as professional engineers and consultants. The engineering Defendants were primarily hired to provide guidance and support to the actual decision makers regarding the April 25, 2014 decision to substitute safe water supplied by DWSD to Flint water and sewer customers, with the highly corrosive and hazardous water from the Flint River.

5.    All Defendants knew that in order to safely supply the Flint water customers with potable water from the Flint River, substantial and significant upgrades and improvements had to be made to the WTP.

6.    All Defendants knew that those upgrades and improvements had not been made between April 25, 2014 and December 6, 2016, and failed to so advise the general public and Plaintiff.

7.    Within days of the introduction of Flint River water into the Flint water delivery system pipelines, the noxious sight, taste, and smell of water flowing from the taps was apparent. All Defendants ignored this initial irrefutable evidence that the water that was being distributed to the City of Flint was highly corrosive, not fit for human consumption and dangerous for human use and exposure.

8.    During the months following April 25, 2014, evidence mounted that the Flint River water was not only unfit for human consumption, but also toxic and unsafe, causing the spread of Legionella bacteria. As a direct and proximate result of the actions described herein, Plaintiff contracted Legionnaire's disease and was hospitalized on December 6, 2016 for six (6) days of treatment.  Plaintiff now suffers permanent pulmonary injuries. Said injuries include, but are not limited to, lost wages, medical expenses not

covered by insurance, physical and emotional damages, as well as pain and suffering.

## JURISDICTION AND VENUE

9. Plaintiff incorporates by reference and makes a part hereof all previous paragraphs as though they were fully set forth herein.

10. Plaintiff is a resident of the City of Burt, Saginaw County in the State of Michigan, and was, at all relevant times, exposed to Flint's contaminated water supply during his employment as a Schwann's delivery person. During his period of exposure to and incubation of the Legionella bacteria, Plaintiff was required to take maintain a route that brought him into Flint, and into homes surrounding McLaren Hospital.

11. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, for cases concerning federal questions.

12. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 (a)(1), for cases where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs and is between citizens of different states

13. This Court has supplemental jurisdiction of the pendant state-law claims under 28 U.S.C. § 1367.

14. This Court has personal jurisdiction over each Defendant because a Michigan Court would have personal jurisdiction under Mich. Comp. Laws § 600.701 and Mich. Comp. Laws § 600.705.

15. Venue is proper in this Court because Plaintiff's claims arose in this judicial district, in Flint, Genesee County, pursuant to 28 U.S.C. § 102, and 28 U.S.C. § 139l (b).

## The Parties

**A.    Plaintiff**

16. Plaintiff incorporates by reference and makes a part hereof all previous paragraphs as though they were fully set forth herein.

17. Plaintiff is an adult, married resident of the City of Burt, County of Saginaw, who was exposed to Legionella bacteria during the last week of November 2016 or first week of December 2016 from which he contracted Legionnaires Disease which has caused him significant pain, suffering, and permanent pulmonary damage.

**B.    Defendants**

18. Plaintiff incorporates by reference and makes a part hereof all previous paragraphs as though they were fully set forth herein.

### i. Emergency Managers

19.  Defendant, former Emergency Manager Ed Kurtz (hereinafter "Kurtz") was the City of Flint Emergency Manager appointed by Michigan State Governor Rick Snyder on November 4, 2012, pursuant to Public Act 72 of 1990. Kurtz served as Flint's Emergency Financial Manager from November 4, 2012 until March 28, 2013. Kurtz is and was, at all relevant times, a public official who acted in concert with Defendants during his term as Emergency Manager of Flint when he knowingly and deliberately created, increased and prolonged the hazards, threats, and dangers that arose due to the replacement of safe drinking water with a highly toxic alternative. He is sued in his individual and official capacities.

20.  Defendant (hereinafter "Earley") was the City of Flint Emergency Manager appointed by Michigan State Governor Rick Snyder on November 1, 2013, and served in this capacity until January 12, 2015. Earley is and was, at all relevant times, a public official who acted in concert with Defendants during his term as Emergency Manager of Flint when he knowingly and deliberately created, increased and prolonged the hazards, threats and dangers that arose due to the replacement of safe drinking water with a highly toxic alternative. He is sued in his individual and official capacities.

21.  Defendant Emergency Manager Gerald Ambrose ("Ambrose") was the City of Flint Emergency Manager appointed by Michigan State Governor Rick Snyder on January 13, 2015, and served in this capacity until April 28, 2015. Ambrose is and was, at all relevant times, a public official who acted in concert with Defendants during his term as Emergency Manager of Flint when he knowingly and deliberately increased and prolonged the hazards, threats and dangers that arose due to the replacement of safe drinking water with a highly toxic alternative. He is sued in his individual and official capacities.

22.  Defendants Kurtz, Earley, and Ambrose (hereinafter "Emergency Managers") continuously controlled all the Flint governmental functions, decisions, and fiscal decisions from 2012 through April 30, 2015.

23.  The Emergency Managers, at all times relevant hereto, were acting within and outside the scope of their employment and/or authority under color of law.

24.  Defendant Emergency Managers ignored warning signs of the dangers associated with drawing City drinking water from the Flint River. Furthermore, they were integral in defrauding, misrepresenting, and falsifying information related to Flint's property and financial affairs, as it affected its citizenry and plaintiff as a visitor to the City, who was injured.

25. Defendant Emergency Managers provided assurances to the public that the Flint River water was safe when they were on actual notice and/or had reason to believe that these assurances were false. Through these false representations, Defendant Emergency Managers permitted the Flint River water to poison thousands of Flint residents damage Flint homes, and infect plaintiff with Legionella Bacteria.

### ii. Private Engineering Defendants

26. Plaintiff incorporates by reference and makes a part hereof all previous paragraphs as though they were fully set forth herein.

27. Defendant Rowe Professional Services Company d/b/a Rowe Engineering Inc., (hereinafter "Rowe") is a Michigan corporation with its principal place of business located at 540 S. Saginaw Street, Suite 200, Flint, Genesee County, Michigan 48502.

28. Rowe maintains an office in Flint, Genesee County, Michigan, regularly conducts business in Flint, Michigan, and has committed torts in Flint, Michigan, which are among the basis for personal jurisdiction under MCL 600.705.

29. Rowe falsified information and ignored warning signs related to the hazards, threats, and dangers that arose by replacing safe drinking water with a highly toxic alternative. Rowe is a private individual Defendant in this action based

on its examinations, findings, and reports as related to the condition of the Flint River and the Flint Water Treatment Plant. Specifically, Rowe is liable for its grossly negligent conduct, including declaring the Flint River water as safe to drink, recommending approval of the use of Flint River water processed in the Flint Water Treatment Plant, and falsely representing that the connection between the Flint River and the Flint Water Treatment Plant had been performed properly and safely. Rowe's conduct caused significant harm to Plaintiff.

30. Defendant Lockwood, Andrews & Newnam, P.C., (hereinafter "LAN PC") is a Michigan professional corporation based in Flint, Michigan. LAN PC was incorporated in 2008 by Lockwood, Andrews & Newnam, Inc. (hereinafter "LAN Inc.") after it was retained by the City of Flint to conduct studies of and reports on the feasibility of a new water supply for the City. LAN was hired by Defendants to provide professional engineering services to place the Flint Water Treatment Plant into operation for using the Flint River as a primary drinking source, and to continue to operate the Water Treatment Plant to maintain the delivery of the Flint River-sourced water to Flint.

31. Defendant LAN Inc. is a Texas corporation with its principal place of business at 2925 Briarpark Drive, Suite 400, Houston, Texas 77042. At all

relevant times, LAN Inc. conducted business in Genesee County through Defendant LAN PC. Per its website, LAN Inc.'s Michigan office is located at 1311 S. Linden Road, Suite B, Flint, Michigan 48532. LAN Inc. holds itself out as a full-service consulting firm offering planning, engineering and program management services, including civil infrastructure engineering and municipal water treatment and design.

32.    Defendant Leo A. Daly Company (hereinafter "LAD") is a Nebraska corporation with its principal place of business at 8600 Indian Hills Drive, Omaha, Nebraska 68114. Per its website, LAD's "[s]ervices are extended through [LAN Inc.]."[1]

33.    The corporate structure of LAD and LAN Inc. is such that LAD exerts nearly unfettered control over its subsidiaries.

34.    Defendants LAN PC, LAN Inc. and LAD (collectively the "LAN Defendants" or "LAN") are defendants in this action based on their collective failure to properly place the Flint Water Plant into operation using

---

[1] LAD's own website reveals that it advertises itself to the world as having "experience, creativity and technical experience ... in every service we offer[,]" which includes "[p]lanning, architecture, *engineering* and interior design, and program management [] delivered by multidisciplinary teams hand-picked to provide the precise combination of expertise required for project success." Additionally, LAD states that "[a]s a multi-disciplinary firm, *engineering is an integral part of **our** process* from the beginning of each project. *Our engineers* work closely with planners, architects and interior designers .... *Our in-house engineers* also provide services for engineering projects independent of architectural design services."

the Flint River as a primary source, specifically neglecting to ensure the viability of the water source for use by the public, and failing to insist upon and implement the necessary safeguards through the plant to allow the water to be safely consumed by the public, and failure to report the dangers associated with not installing proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

35. The LAN Defendants maintain an office, regularly conduct business and have committed a tort in Flint, Genesee County, Michigan, which are among the basis for personal jurisdiction under MCL 600.705.

36. Defendant Veolia North America, LLC (hereinafter "Veolia LLC") is a Delaware Limited Liability Company with its principal place of business at 200 E. Randolph Drive, Suite 7900, Chicago, Illinois 60601.

37. Defendant Veolia North America Inc. (hereinafter "Veolia Inc.") is a Delaware Limited Liability Company with its principal place of business at 200 E. Randolph Drive, Suite 7900, Chicago, Illinois 60601.

38. Defendant Veolia Water North America Operating Services, LLC (hereinafter "Veolia Water") is a Delaware Limited Liability Company with its principal place of business at 101 W. Washington Street, Suite 1400 East, Indianapolis, Indiana 46204.

39. Veolia LLC, Veolia Inc. and Veolia Water design and provide water solutions for communities and industries across North America under the banner "Veolia North America."

40. Defendant Veolia Environment S.A. (hereinafter "Veolia S.A.") is a French, transnational corporation with its principal place of business at 36-38 Avenue Kleber, 75116, Paris, France. Veolia S.A. provides its services through, and thus derives its revenues from, its four global divisions — water management, waste management, public transport and energy services. The divisions provide its services across the globe, and in North America, those services are provided under the aforementioned moniker "Veolia North America."

41. In or around 2005, Veolia S.A. united these four global divisions under a single umbrella, and since then, has held out itself and all other Veolia entities to the world simply as one "Veolia." Indeed, Veolia S.A. adopted this simple "Veolia" branding across all of its businesses, which is evidenced on its website and press releases.

42. The four global divisions are composed of the subsidiaries and other businesses owned and otherwise controlled by Veolia S.A.

43. Veolia S.A. and its divisions also underwent a restructuring beginning around 2011. As described by Veolia S.A. Chair and CEO Antoine Frerot,

"[o]ur new organization is based on some simple principles—operating as an integrated company, *establishing a single Veolia in each country*, setting up regional management teams and strengthening corporate management functions." Veolia 2013 Annual and Sustainability Report at 10 (emphasis added), available at http://www.veolia.com/en/2013-activity-and-sustainability-report. Stated differently, "[t]he new Veolia is one Veolia." *Id.* at 14.

44.     As a result, the corporate structure of Veolia S.A., Veolia LLC, Veolia Inc. and Veolia Water (collectively, the "Veolia Defendants" or "Veolia") is such that Veolia S.A. exerts nearly unfettered control over the entire Veolia empire. The Veolia Defendants hold themselves out to the world as a single entity, examples of which are numerous and readily observed in the public domain.

45.     For example, the Veolia website makes no effort to distinguish or advertise any distinct legal entities, instead grouping them together and collectively presenting themselves to the world as "Veolia." When "Veolia" advertises the number of its employees and reports its annual revenue, it does so collectively.

46.     Upon information and belief, the same top executives control Veolia Defendants, and revenues are commingled and reported as one.

47.  As such, Veolia Defendants disregard corporate formalities and do not adequately or separately capitalize each of their respective businesses.

48.  Veolia Defendants collectively maintain several offices in Michigan, including in Westland, Livonia and Grand Rapids; regularly conduct business in Michigan; and have committed torts in Michigan, which are bases for personal jurisdiction in this Court pursuant to MCL § 600.715.

49.  Veolia Defendants are parties to this action based upon providing professionally negligent engineering services in reviewing Flint's water system and declaring the water safe to drink.

50.  Veolia Defendants have abused the corporate form to avoid liability in this matter. Indeed, while it appears Veolia Water may have executed the subject contract with the City of Flint, Veolia Defendants, together, as indistinguishable entities, performed services and presented their conclusions as "Veolia." At all times relevant, Veolia Defendants have represented to the world that they are not distinct legal entities but rather one and the same.

## STATEMENT OF FACTUAL ALLEGATIONS

### A. Factual Allegations Relating to the Private Engineer Defendants[2]

#### i. Consideration of and Decision to Change Drinking Water Source: Studies Warned of Dangers with Use of Flint River Water

51.     Plaintiff incorporates by reference and makes a part hereof all previous paragraphs as though they were fully set forth herein.

52.     Like the residents of any American city, Flint residents rely on a steady supply of safe and clean water to use in the course of their daily lives. Flint also has commercial and other non-residential properties whose owners rely upon clean and safe water.

53.     The Flint WTP was constructed in 1917 to draw water from the Flint River as the source of Flint's drinking water for nearly 50 years until 1964.

54.     As early as 1964, the U.S. Geological survey noted high levels of chloride in the Flint River. Due to the concerns regarding the adequacy of the Flint River to provide safe drinking water, Flint evaluated alternatives for a new water supply, and ultimately switched providers. From 1964 to 2014, Flint water users received their water from Lake Huron via the DWSD. This water did not require treatment through the WTP.

---

[2] The term "Private Engineering Defendants" refers collectively to the Veolia, LAN and Rowe Defendants.

55.   During this half-century, Flint water users enjoyed safe, clean, fresh water in their homes, businesses, hospitals and other places of public services.

56.   Since approximately the 1990s, Flint and other local governmental entities had growing concerns over the cost of the DWSD water supply. Amidst these growing concerns, Flint and the other local governmental entities–which included Genesee County, Lapeer County, and Sanilac County–commissioned studies for alternative water supplies. Certain studies were completed in 1992.

57.   A 2001 report by the Department of Natural Resources noted that certain businesses along the Flint River had permits to discharge runoff from industrial and mining activities as well as petroleum and gasoline cleanups.

58.   In 2004, a technical assessment of the Flint River raised concerns about using the river as a source of drinking water.  The U.S. Geological Survey, the MDEQ, and the Flint Water Utilities Department prepared a technical assessment entitled "Source Water Assessment Report for the City of Flint Water Supply – Flint River Emergency Intake."  One of the key points was that the Flint River was a highly sensitive drinking water source that was susceptible to contamination.

59.   Flint and the local governmental entities again commissioned studies for alternative water supplies, which were completed in 2006 and 2009.

60. The 2009 study, prepared by Rowe, LAN, and others, evaluated two alternatives for water supply: 1) continue to purchase from DWSD, or 2) construct a new pipeline, later known as the Karegnondi Water Authority (hereinafter "KWA") pipeline, from Lake Huron.

61. In 2011, Flint government officials commissioned a study (or studies) by LAN and Rowe to determine if the City could safely use the Flint River the primary source of drinking water. One of those studies, entitled "Analysis of the Flint River as a Permanent Water Supply for the City of Flint" (hereinafter the "2011 Report"), which bore LAN's and Rowe's respective logos, was published in July of 2011.

62. The 2011 Report stated that chemically treating Flint River water on a continuous basis would be a challenge and more expensive than chemically treating lake water. It concluded that "water from the river can be treated to meet current regulations; however, additional treatment will be required than for Lake Huron Water . . . . Although water from the river can be treated to meet regulatory requirements, aesthetics of the finished water will be different than that from Lake Huron." The study further concluded that such treatments to Flint River water could be done if improvements were made to the Flint WTP. However, if used as a water supply, the study noted that "a

source water protection management plan should be developed to . . . identify potential sources of contamination . . . ."

63. LAN also prepared an additional analysis, attached to the 2011 Report as an appendix, which detailed over $69 million in improvements that would have to be made to bring the Flint WTP up to current standards. This additional analysis specifically projected costs for corrosion control chemicals that would be required to ensure the safety of water to be drawn from the Flint River.

### ii. Rowe Served as City Engineer for Flint During the Relevant Time Period.

64. The Flint City Charter requires the City to have a city engineer. Moreover, in order to receive State and Federal funding for projects, it is mandatory for Flint to have a City Engineer to certify and submit required documentation.

65. In 2007, Rowe was awarded the job to provide professional engineering services as City Engineer to Flint for a five-year period. Rowe provided those services to Flint pursuant to City Contract 07-103 under the broad categories of engineering, surveying, and project management/administration (both design and construction) and technical assistance.

66.     In January of 2012, Flint Emergency Manager Kurtz executed a resolution authorizing Flint to enter into Change Order No. 9, which would extend Rowe's contract as City Engineer from January 1, 2012 to June 30, 2013.

67.     In September of 2013, the City re-hired Rowe for professional services for the 2014 fiscal year, wherein Rowe would continue to serve as City Engineer.

### iii. Flint's Water Supply Is Switched to the Flint River Without the Provision of Corrosion Control.

68.     In November of 2012, Flint Emergency Financial Manager Kurtz wrote to State of Michigan Treasurer, Andy Dillon, suggesting that Flint join the yet to be formed KWA due to projected cost savings over DWSD. This was pursuant to the Emergency Financial Manager's mandate to cut costs.

69.     In December of 2012, during a meeting with the State of Michigan Treasury, the City rejected the Flint River as a water source because of the comparatively high costs of preparing the Flint WTP to treat water drawn from the Flint River to applicable standards.

70.     In early 2013, Flint Emergency Financial Manager Kurtz signed an agreement to switch Flint's primary drinking water source from the DWSD to the newly formed KWA, which was scheduled to become operational sometime in late 2016.

71.     Kurtz and other government officials proposed drawing drinking water from the Flint River until the KWA was completed.

72.     In or around June 2013, Emergency Manager Kurtz hired LAN to advise the City with respect to using the Flint River as the City's water source during the construction of infrastructure for the KWA. LAN advised the City regarding the design of an upgrade to the Flint WTP and stated that "quality control could be addressed."

73.     On June 10, 2013, LAN submitted a proposal to Flint for upgrading the FWTP entitled "Flint Water Treatment Plant Rehabilitation – Phase II." The proposal was to make "improvements . . . intended to help the City operate[] the plant on a full-time basis using the Flint River." The proposal was signed by J. Warren Green, Professional Engineer (Project Director) and Samir F. Matta, Professional Engineer (Senior Project Manager). LAN claimed in its proposal that its "staff has the knowledge, expertise and the technical professionals to handle all aspects of the projects. Our staff has firsthand knowledge of the [FWTP] . . . ."

74.     The proposal included the following relevant sections:

        a.  A "Scope of Services" section that stated the "project involves the evaluation and upgrade of the Flint Water Plant to provide continuous water supply service to the City of Flint (Flint) and its customers." The upgrades and improvements would allow the use of the Flint River as a water supply.

b. A "Standards of Performance" section where LAN "agree[d] to exercise independent judgment and to perform its duties under this contract in accordance with sound professional practices." As part of the proposal, it was understood that Flint was relying upon the professional reputation, experience, certification, and ability of LAN.

75. On or about June 26, 2013, Kurtz signed a resolution authorizing Flint to enter into a professional services contract with LAN to place the Flint WTP into full-time operational use, which would draw water from the Flint River as its primary source of water until the completion of the KWA.

76. Flint formally retained LAN as the design engineer for improvements and upgrades to the FWTP for the treatment of new water sources, including both the Flint River and the KWA pipeline. In deciding to proceed with the transition to the Flint River, the City of Flint noted LAN's "extensive experience in this field," and relied upon LAN's identification of the "engineering, procurement, and construction needs" for the project. Although the City recognized that water from the Flint River "would be more difficult to treat," the City concluded, based on LAN's recommendations, that the Flint River was "viable as a source" of the City's

water.[3] LAN continued to advise the City with respect to its transition to the Flint River through 2015, and ultimately was paid more than $3.8 million for its engineering services. City officials, including then-Mayor Walling, relied upon LAN's advice in pronouncing the City's water to be safe.

77. The transition to the Flint River as a primary water source presented many well- known challenges and dangers. Flint's water treatment plant had not been needed to treat the water received from DWSD, as DWSD provided the water in an already treated state. It is critical that a new source of water be properly studied and treated to ensure that its use will not result in the corrosion of pipes in the delivery system. This is particularly important where portions of the delivery system, included but not limited to service lines, are made of lead. According to the EPA, "it is critical that public water systems, in conjunction with their primacy agencies and, if necessary, outside technical consultants, evaluate and address potential impacts resulting from treatment and/or source water changes." Various factors specific to individual water sources necessitate different treatments, including but not limited to the use of chemical additives. The water obtained from the Flint River was substantially more corrosive than the

_____

[3] *See* City of Flint, Water System Questions & Answers (Jan. 13, 2015) available at http://mediad.publicbroadcasting.netlp/michiganlfiles/201512/CoF-Water-SystemFAQ-1-16- 2015.pdf

treated water Flint had been receiving from DWSD. Water becomes more corrosive when it contains greater quantities of chloride, which can enter the water from manmade and natural sources. Flint River water is known to contain about 8 times more chloride than Detroit water. It is well known that corrosive water that is not properly treated results in the corrosion of pipes, such that the metals in the pipes, including lead, will leach into drinking water. Phosphates are often added to corrosive water as a method of corrosion control, to prevent metals from leaching into the water.

78. There were no bids submitted by LAN or any other firm for this work, nor were any other firms considered for this work. The contract was awarded without competitive bidding.

79. On June 29, 2013, LAN met with representatives of Flint, representatives of the Genesee County Drain Commissioners Office and the MDEQ to discuss:

   a. Using the Flint River as a water source;

   b. The ability to perform the necessary upgrades to the FWTP;

   c. The ability to perform quality control;

   d. The ability for Flint to provide water to Genesee County;

   e. The ability to meet an April or May 2014 timeline; and

   f. Developing a cost analysis.

80. According to incomplete meeting minutes, "the conversation was guided with focus on engineering, regulatory, and quality aspects . . ." of the items previously referenced, and the following determinations were made:

   a. The Flint River would be more difficult to treat, but was viable as a source;
   b. It was possible to engineer and construct the upgrades needed for the treatment process;
   c. It was possible to perform quality control "with support from LAN engineering which works with several water systems around the state, quality control could be addressed[;]"
   d. FWTP did not have the capacity to treat and distribute sufficient water to meet the needs of Flint and Genesee County;
   e. There were many obstacles to overcome, but completion by the April or May 2014 timeline was reachable; and
   f. The next steps were for LAN to present Flint with a proposal that would include engineering, procurement, and construction needs for the project along with cost estimates.

81. Upgrading the Flint WTP would have its challenges. Since 1965, the Flint WTP served as a secondary and backup water supply system to the DWSD. Typically, a secondary supply for a public water system would be needed only during emergency situations, and is normally designed for short- term operation such as providing the average daily demand for only a few days.

82. The Flint WTP was previously upgraded in or around 2004 in order to allow it to operate for an extended short-term period (i.e., approximately 6 weeks).

83. Due to the aforementioned 2013 agreement, the Flint WTP needed upgrading to operate on a full-time basis, otherwise it would be unable to provide the citizens of Flint with sufficient quantities of water.

84. In April of 2014, LAN, Flint and MDEQ officials addressed and discussed optimization for lead, and they decided that having more data was advisable before implementing an optimization method.

85. On April 9, 2014, the City received the necessary permits from MDEQ to draw Flint River water for distribution as the supply source for its water distribution system during the multi- year transition to the new KWA facility.

86. Despite receiving these permits, the water system was not ready to become operational.

87. The Flint water system was not prepared for the switch to Flint River water. The Flint River, it turned out, was contaminated with rock-salt chlorides washed into the river from road surfaces over the course of many harsh Michigan winters. The level of chlorides in the Flint River was eight times the levels provided in DWSD water. Chlorides are highly corrosive, and must be neutralized with anticorrosive agents before entering public water systems.

88.	LAN knew, if not recommended, that the Flint WTP would begin drawing water from the Flint River later that month that would not be treated with anti-corrosive measures. Moreover, the potential consequences in endangering the public health as a result of not using anti-corrosive treatments when using water from the Flint River as the primary source were or should have been well-known and foreseeable to LAN, an engineering firm that, according to its website, is a "national leader in the heavy civil infrastructure engineering industry," "one of the most respected engineering firms in the United States today," and "a recognized leader in the industry with a rich history of serving a diverse group of heavy civil infrastructure clients across the country."

89.	From July of 2013 through April of 2014, LAN provided its professional services, but failed to meet its duty of care and competence. LAN was responsible for providing engineering services to make Flint's inactive water treatment plant sufficient to treat water from each of its new sources. LAN's actions facilitated the transfer of Flint's water source to river water without proper corrosion control treatment. The improvement and upgrade plans to the Flint WTP were approved by MDEQ in April of 2014 pursuant to plans and specifications signed and sealed by LAN. LAN, as Flint's outside contractor, had a duty to recognize the need for corrosion control and advise

that it should be implemented. Yet, incredibly, at the time of the switch to Flint River water, no phosphates were being added to the water supply. In fact, nothing whatsoever was being done to account for the corrosive nature of the Flint River water. Moreover, LAN did not require water quality standards to be set for the Flint River water that would be delivered to Flint's residents and property.

90.     On April 25, 2014, Flint officially began using the Flint River as its primary water source, despite the fact that the proper preparations had not been made.

91.     Within weeks of switching water sources, complaints began to pour in from residents regarding the smell, taste, and color of the drinking water.

92.     In the midst of growing concerns about the safety of its water, Flint engaged two engineering companies to provide their professional opinion regarding the necessary changes to render the water compliant with state and federal laws. First, the City engaged LAN.

93.     On August 14, 2014, Flint's water tested above legal limits for total coliform and E. coli bacteria. In response, the City issued boil water advisories on August 16, 2014 and September 5, 2014.

94.     To address the bacteria problem, the water was treated with additional chlorine. However, as has been well known for decades, in corroded pipes,

chlorine preferentially reacts with the bare metal instead of attacking solely bacteria. The addition of substantial amounts of chlorine to a water supply was thus ineffective in treating bacteria – so more chlorine was added.

95. The use of chlorine to disinfect water produced various disinfection byproducts, including Trihalomethanes (often referred to as "Total Trihalomethanes" or "TTHM"). When bare pipes are not protected with a corrosion control protocol, more chlorine yields more TTHM.

96. Immediately after the discovery of Flint's bacterial problems, it was apparent that Flint's TTHM levels were high. This should have been a red flag that the steel in the pipes had been laid bare by the high salt concentrations the water pumped from the Flint River.

97. As officials were beginning to assess the extent of Flint's TTHM problems, another problem emerged in the summer of 2014 – the Michigan Department of Health and Human Services ("MDHHS") reported an outbreak of Legionnaires' disease – another red flag.

98. Legionnaires' disease is a severe form of pneumonia which, when treated early enough, has a mortality rate of 20%; if left untreated, the rate rises to 80%. Infection in humans occurs when water droplets contaminated with legionella bacteria are inhaled or when water- containing legionella enters the trachea. Extensive studies of legionella have established that the

pathogen enters the water supply when the "bio-film" protecting pipes is stripped away – which is exactly what happened when the River's corrosive water entered the City's pipes.

99. As early as October 1, 2014, it was known that one of the causes of the bacterial contamination was the existence of iron pipes in the City's water distribution system.

100. Most of Flint's 550 miles of water mains are now over 75 years old and constructed of cast iron piping. Cast iron pipe is subject to internal corrosion, called tuberculation, which causes buildup on the pipe interior, leading to water quality issues, reduced flow and pressures, and leakage. Tuberculation also encourages the development of biofilms, layers of bacteria that attach to the interior pipe wall.

101. On October 13, 2014, General Motors ceased using Flint River water at its engine plant because of fears that it would cause corrosion due to high levels of chloride.

*iv. LAN Was Asked to Evaluate the Problems But Failed to do so Properly.*

102. In November of 2014, LAN was on actual notice of the need to assess the factors contributing to high TTHM levels following the water source change. LAN was engaged to evaluate this issue by Flint and provide a report of its findings, which it did in August of 2015.

103. LAN issued a 20-page Operational Evaluation Report on November 26, 2014. The report was intended to address compliance with EPA and MDEQ operations and regulations. LAN entirely failed to address the hazard of lead associated with the corrosive water flowing through the pipes, at least half of which were made of lead.

### v. The Water Problem Became Publicly Known.

104. On December 31, 2014, the first round of lead monitoring showed results exceeding the Lead and Copper Rule's action levels for lead, 15 parts per billion. Worse yet, these samples were not drawn from the homes with the highest risk of exposure, as required by the Lead and Copper Rule.

105. On January 2, 2015, the City of Flint mailed a notice to its water customers indicating that it was in violation of the Safe Drinking Water Act due to the presence of Trihalomethanes. It was claimed that the water was safe to drink for most people with healthy immune systems.

106. The fact that the Flint River water contained such high levels of bacteria is a product of the horrific decision not to implement corrosion control.

### vi. Veolia Was Hired to Evaluate and Respond to the Water Problem.

107. Veolia submitted to Flint its "Response to Invitation to Bid for Water Quality Consultant," Proposal No. 15-573. Veolia proposed "to address the immediate reliability and operational needs" of Flint's water system.

108. Flint requested the following engineering services:

    a. To review and evaluate "the City's water treatment process…and procedures to maintain and improve water quality";

    b. To develop and report with recommendations "to maintain compliance with both State of Michigan and federal agencies"; and

    c. To assist the City in implementing the recommendations.

109. In February of 2015, the City hired Veolia through a resolution that incorporated a standard of performance clause, which stated that "the City is relying upon the professional reputation, experience, certification, and ability of [Veolia]."

110. Defendant Veolia's task was to review Flint's public water system, including treatment processes, maintenance procedures, and actions taken. As water treatment professionals, Veolia had an opportunity to catch what LAN and Rowe had missed or refused to warn about – corrosive water was being pumped through lead pipes into the homes of Flint residents without corrosion control.

111. On February 10, 2015, Veolia and the City issued a joint press release to the community at large, indicating that Veolia was an "urban water expert" in "handling challenging river water sources" and that it would be evaluating all of the City's water treatment processes.

112. The press release contained no limitation on Veolia's scope of work. David Gadis, the Vice President of Veolia North America's Municipal &

Commercial Business stated, "We understand the frustration and urgency in Flint[.] We are honored to support your community with our technical expertise so that together we can ensure water quality for the people of the city of Flint." He continued, "We have extensive experience handling challenging river water sources, reducing leaks and contaminants and in managing discolored water." Based on these representations, the people of Flint had every reason to rely on Veolia's subsequent representations of safety.

113. On February 12, 2015, Rob Nicholas, Veolia's Vice President stated: "We're going to look at the numbers, we're going to look at the plant, we're going to decide how the equipment's functioning, look at the raw water, look at the finished water, decide how it's getting through the pipe to the house, and from that, decide how to fix each of those problems as we go forward."

114. Despite its representations that it would conduct a thorough, all-encompassing review of the Flint Water system, it took Veolia only 6 days to issue an interim report on its findings, which it presented to a committee of Flint's City Council on February 18, 2015. Per the interim report, the only issue not in Veolia's scope of study was "why the change from [Lake Huron water via the Detroit system pipeline to Flint River water] or the history of the utility." In other words why was this switch necessary.

115. In the interim report, Veolia indicated that Flint's water was "in compliance with drinking water standards." Additionally, Veolia noted that "[s]afe [equals] compliance with state and federal standards and required testing." Veolia publicly declared that Flint's water was safe.

116. Veolia's interim report also noted that the discoloration in Flint's water "raises questions," but "[d]oesn't mean the water is unsafe." The report noted that among Veolia's "next steps" were to "carry out more detailed study of initial findings" and "[m]ake recommendations for improving water quality."

117. In response to potential questions about "[m]edical problems," Veolia's interim report dismissively claimed that "[s]ome people may be sensitive to any water."

118. Veolia issued its final "Water Quality Report" dated March 12, 2015.

119. In the final report, Defendant Veolia noted that it had conducted a "160-hour assessment of the water treatment plant, distribution system, customer services and communication programs, and capital plans and annual budget." The final report claimed that "a review of water quality records for the time period under our study indicates compliance with State and Federal water quality regulations."

120.	The final report states, "the public has also expressed its frustration of discolored and hard water. Those aesthetic issues have understandably increased the level of concern about the safety of the water. The review of the water quality records during the time of Veolia's study shows the water to be in compliance with State and Federal regulations, and based on those standards, the water is considered to meet drinking water requirements."

121.	Specifically addressing the lack of corrosion control, the final report notes that "[m]any people are frustrated and naturally concerned by the discoloration of the water with what primarily appears to be iron from the old unlined cast iron pipes. The water system could add a polyphosphate to the water as a way to minimize the amount of discolored water. Polyphosphate addition will not make discolored water issues go away. The system has been experiencing a tremendous number of water line breaks the last two winters. Just last week there were more than 14 in one day. Any break, work on broken valves or hydrant flushing will change the flow of water and potentially cause temporary discoloration."

122.	In addition to missing the connection between the lack of corrosion control and lead contamination, Defendant Veolia made a permissive "could" suggestion aimed only at reducing aesthetic deficiencies while suggesting

that Flint's drinking water met all applicable requirements and was safe to drink.

123. In fact, not only did the report fail to discuss lead corrosion, the use of polyphosphate, as suggested, only deals with iron corrosion and could worsen lead corrosion.

### vii.    LAN and Veolia Fail to Conduct a Root Cause Analysis.

124. Both LAN and Veolia were hired to ensure Flint's water system was protective of human health and compliant with federal and state environmental statutes. In February 2015, LAN issued its report "Trihalomethane Formation Concern," and on March 12, 2015, Veolia issued its report, "Flint Michigan Water Quality Report." Critically absent from both reports was a root cause analysis of why the high TTHM levels existed. Engineers typically use a root cause analysis to determine the origin, case and interrelationship of events, whenever an adverse event occurs. Understanding why an event occurred is critical to developing effective recommendations for dealing with an event. It is important to note that a root cause analysis would not have required invasive testing, just consideration of the facts known to date and drawing a conclusion about their interrelationship. Had such an analysis been done, the consultants would

have presumably discovered the corrosion of the pipes, and reported on the presence of lead and legionella in the water system.

125. The causal relationship of events leading to the high TTHM levels is not complex science. It is widely known in the scientific community that:

    a. Road salt from decades of deicing contaminates northern rivers such as the Flint River;
    b. Road salt contains chloride, which is highly corrosive to steel and lead pipes and that such pipes are used throughout Michigan and Flint;
    c. Chloride strips pipes of protective surfaces which frees legionella and lead;
    d. Urban rivers contain high levels of E. coli;
    e. While chlorine is effective in treating E. coli, it becomes far less effective when bare metal has been exposed because the chlorine preferentially reacts with the metal;
    f. The need to add excessive chlorine is indicates that bare metal has been exposed, and that corrosion is occurring; and
    g. Excessive chlorination causes high TTHM levels.

126. LAN's and Veolia's failure to conduct a root cause analysis recognizing the corrosion's role in Flint's water problems is truly inexplicable because as detailed above all of these events had been highly publicized before they issued their report:

    a. The Flint River had been highly impacted by road salt for decades—the river had eight times more salt than water supplied by the DWSD;
    b. Lead and steel pipes are ubiquitous in the United States, Michigan and Flint;
    c. In the summer of 2014, Flint suffered one of the worst outbreaks of Legionnaires' disease in U.S. history;

d. On October 14, 2014, GM stops using the City's water because of corrosivity. It was reported next day in press;

e. On January 9, 2015, UM Flint shut its water fountains because lead exceed federal standards; and

f. In February 2015, if not before, lead in drinking water in other locations also exceed the standards.

127. Any of these red flags, and indeed the general knowledge in the scientific community, should have alerted LAN and Veolia to the extensive corrosion and resultant release of lead and legionella in the City's drinking water system.

128. For example, it should have been obvious to LAN and Veolia – as professed experts on water quality and treatment issues – that a small river in an urban environment, such as the Flint River, would be contaminated by chlorides from salt used in road de-icing operations during many Michigan winters. In February 2004, the MDEQ, the U.S. Geological Survey ("USGS"), and the City completed an assessment of the Flint River as a possible source of drinking water and concluded that it had a very high susceptibility to potential contamination sources. Moreover, a simple comparison of the chloride levels in the Flint River with that provided by the DWSD, Flint's prior water source, should have quickly alerted LAN and Veolia to potentially serious corrosion issues as the Flint River contains about eight-times more chloride than the DWSD-supplied water. The Flint River water

also had an extremely high chloride-to-sulfate mass ratio ("CSMR") of 1.6. Normally, a CSMR ratio of greater than 0.5 is a cause for serious concern. Had LAN or Veolia investigated the chloride-to-sulfate ratio in the Flint River, as would be expected of an engineer of ordinary diligence, they would have immediately had reason to believe that Flint's CSMR posed serious corrosion risks.

129. The City's inability to effectively treat E. coli with chlorine should have likewise alerted LAN and Veolia to the existence of corrosion. It is well established by governmental authorities and the scientific community that the inability to treat E. coli with chlorine is often caused by heavily corroded piping. According to a study published by the U.S. EPA, high E. coli concentrations are a product of corrosion, and the inability to treat E. coli with chlorine is caused by corroded pipes. Flint's inability to treat E. coli with moderate amounts of chlorine – and the resulting high TTHM concentrations – should have placed LAN and Veolia on notice that Flint's pipes were corroding and releasing lead and other materials into the drinking water supply. The uptick in reported cases of Legionnaires' disease, reported during a press conference prior to LAN's and Veolia's retention, should have put LAN and Veolia on notice that Flint's water system exhibited signs of corrosion. Legionella, the bacteria that causes Legionnaires' disease,

grows on the film on the inside of pipes, which when stripped away by corrosion frees the legionella into the drinking water system. Outbreaks of Legionnaires' disease are rare unless pipes have been stripped of their bio-film by warm, corrosive water—which is exactly what existed in the Flint River and water supply. Yet neither LAN nor Veolia drew a connection between the outbreak and the cause of the outbreak. Nor for that matter, did they make any recommendations to treat the water to prevent or abate an outbreak.

130. In addition, it was also very well known in the scientific community that pipes, especially old municipal water service lines, contain lead and that corroded pipes leach lead into the drinking water supply. "Lead has been a challenge and a bane for water suppliers since historical times ... The numerous articles printed in leading scientific journals, in the United Kingdom and United States, in the late nineteenth century, documenting thousands of cases of lead poisoning caused by lead water pipes, have largely faded in the mist of history. These cases often resulted in death, paralysis, blindness, insanity, convulsions, miscarriages and still births." Dr. Colin Hayes *et al.*, Best Practice Guide on the Control of Lead in Drinking Water, Foreword (Dr. Colin Hayes ed. 2010). As just one of hundreds of examples, a summer 2010 report by the Water Research Foundation stated:

"Lead concentrations in tap water are strongly influenced by distribution system water chemistry. In response to changes in water chemistry, high lead concentrations can also be observed in systems with no previous history of a lead problem ... Solubility and dissolution rates of corrosion products are affected by water chemistry parameters including pH, dissolved inorganic carbon, orthophosphate, and the concentration and type of disinfectant residual." These are the exact conditions that existed in Flint's water supply.

131.   Finally, just the color of Flint's water should have led any reasonable engineer to the conclusion that Flint's pipes were dangerously corroded. The source of Flint's water discoloration was rust, a product of steel and lead corrosion. The presence of rust in the water should have alerted LAN and Veolia that Flint's water was corroding its pipes, and that there was thus a danger that lead was leaching into the Flint water system.

### viii.   LAN and Veolia's Conclusion made the Situation Worse.

132.   The conditions leading to the release of lead are heavily regulated by the federal government, and indeed Veolia agreed in its scope of work with the City to determine whether such regulatory standards had been met. The federal government mandates the implementation of corrosion control protocols in order to protect the public against the possibility of lead

entering the drinking water due to corroding pipes. Concern over lead concentrations in drinking water motivated the passage of the *Lead* and Copper Rule (LCR) in 1991. The LCR requires utilities to implement methods to control lead corrosion if the 90th percentile of samples exceeds the action level of 0.015 mg/L. *See* 40 C.F.R. pt. 141, sub. E and I. Flint's own sampling analysis indicated that its system violated the LCR standards.

133. Veolia, however, failed to conduct any analysis. Nevertheless, it made the false statement in its March 12, 2015 report that its "review of water quality records for the time period under our study indicates compliance with State and Federal water regulations." Veolia and LAN knew or should have known that the Flint water system was in violation of federal safe drinking water standards. Veolia's statement that Flint's water system complied with the LCR prolonged the crisis to this day.

134. Another reason for the corrosion of pipes is the drinking water's acidity. It is well known that the decay of pathogens and other organic materials such as those found in the Flint River causes water to become more acidic.

135. Additionally, water quality engineers know that the addition of acidic water quality treatment chemicals, such as ferric chloride which is used as a coagulant to settle out particles at the water treatment plant, can further increase the water's acidity. According to the EPA, "[i]f the raw water for a

utility has a relatively high concentration of chloride and a history of lead corrosion problems, coagulants that add to chloride concentration should be avoided. Also, since a lower pH will increase corrosion in almost all cases, a utility should consider the finished water pH goal before implementing enhanced coagulation." U.S. EPA Office of Water, *Enhanced Coagulation and Enhanced Precipitative Softening Guidance Manual* § 6.4, (EPA 815-R-99-012, May 1999).

136.  Veolia should have recommended maintaining the drinking water's neutral pH by adding phosphate, but instead, in direct contradiction of federal authorities, recommended increasing the dosage of ferric chloride – a very potent, corrosive acid. According to the Centers for Disease Control and Prevention:

> Chemical additives are added to water during the water treatment process. More than 40 chemical additives can be used to treat drinking water. Many of these commonly used additives are acidic, such as ferric chloride and aluminum sulfate, which are added to remove turbidity and other particulate matter. . . . These acidic water treatment additives can interfere with corrosion protection. . . . Lead and copper are rarely detected in most drinking water supplies. However, these metals are a concern to consumers. Because some household plumbing fixtures may contain lead or copper, corrosive waters may leach (pick up) lead and copper from household plumbing pipes after entering a home. . . . The most common reason for water utilities to add corrosion inhibitors is to avoid lead and copper corrosion with older homes, and the second most common reason is to minimize corrosion of pipes in the distribution system. . . . The tendency of water to be corrosive is controlled principally by monitoring or adjusting the pH, buffer intensity, alkalinity, and concentrations of

calcium, magnesium, phosphates, and silicates in the water.[4]

137.    Nowhere did Veolia recommend that the City take steps to institute corrosion control to prevent lead and legionella from spreading throughout the City's water supply. Veolia merely suggested the implementation of corrosion control (here the addition of phosphates or other corrosion controls) as a *possible*, but not wholly effective means for minimizing *water discoloration*. There was no mention of the need to add corrosion control to prevent the release of lead and legionella. Veolia's report states, "The water system *could* add a polyphosphate to the water as a way to minimize the amount of *discolored water*." (Emphasis added). The report explained that, "Polyphosphate addition will not make *discolored water* issues go away." (Emphasis added). Thus, rather than recognizing that corrosion control was *required* to render Flint's water system compliant with federal regulations and prevent catastrophic corrosion, Veolia merely suggested adding phosphate to address water discoloration. Even Veolia's *suggested* dosage to address discoloration, 0.5 mg/L was far too low. In February 2016, the City was adding four to eight times as much phosphate, 2 to 4 mg/L.

---

[4] *See* Centers for Disease Control and Prevention, *Fluoridation of Drinking Water and Corrosion of Pipes in Distribution Systems Fact Sheet*, http://www.cdc.gov/fluoridation/factsheets/engineering/corrosion.htm (last updated July 10, 2013).

138.	Veolia's conclusion that no efforts needed to be undertaken to maintain the neutrality of the water supply, is presented as a scientific certainty however. The March 2015 report states that prior to arriving at its conclusions, Veolia undertook "laboratory testing" and concluded that, "[c]urrent ferric chloride dosages are too low and dosages of 100 mg/L or more are recommended." Veolia acknowledged that its recommended increase was significant: "This increase to 100 mg/L is twice what is currently being fed and much higher than what had previously been fed last year."

139.	At the same time that Veolia gave the unqualified opinion that the current dosage is "too low," and should be doubled, Veolia knew that the City had no corrosion control protocol and knew (or should have known) that significant corrosion was already occurring. Veolia's directive that the City double its dosage of ferric chloride was unqualified and in no way warned that acidic water would increase corrosion.

140.	In August 2015, LAN made the same recommendation to increase the dose of ferric chloride.

141.	LAN and Veolia should have told the City to *reduce* the concentration of ferric chloride, and that adding phosphate as a pH buffer was *mandatory*. No such recommendation was made, and as a result, the lead and legionella bacteria courses through the City's water supply to this day.

142. A graph prepared by the Flint Water Study Group from Virginia Tech University shows that the pH of Flint's water distribution system became more acidic after the Veolia Report was issued in March, even as the pH in the Flint River became less acidic:



143. The graph above shows that the Flint River had a harmless pH at or above 8.0 for all of 2015, and steadily increased after June. By comparison, the graph shows that the pH in Flint's municipal water supply started dropping steadily from 7.9 in March (just after Veolia made its recommendation to double the ferric chloride concentration) to 7.3 in August. This difference is significant. pH is measured on a logarithmic scale, meaning that a pH of one whole number, such as 7.0 is ten times more corrosive than a pH of another whole number, such as 8.0 The drop in pH from 7.9 to 7.3 indicates a dramatic increase in the corrosivity of Flint's water.

144. The graph above is punctuated with quotes from Defendants' emails and other documents that illustrate the contradictory information provided by State officials regarding the existence of corrosion control measures and lead in Flint's drinking water.

145. On June 24, 2015, the U.S. EPA reached a similar conclusion about the City's addition of ferric chloride:

> In addition, following the switch to using the Flint River, the City of Flint began adding *ferric chloride*, a coagulant used to improve the removal of organic matter, as part of the strategy to reduce the TTHM levels. Studies have shown that an increase in the *chloride-to-sulfate* mass ratio in the water can adversely affect lead levels by *increasing the galvanic corrosion of lead in the plumbing network.*[5]

146. Both LAN and Veolia analyzed the pH in Flint's water. Both made recommendations about the addition of chemicals that affect pH. Both were negligent in their analysis of the pH and their recommendations. Had the City started adding polyphosphate or otherwise controlled for corrosion, or decreased the dosage of ferric chloride, less lead and legionella would have been released into Flint's water supply.

---

[5] *See* Memorandum, High Lead Levels in Flint, Michigan - Interim Report, from Miguel A. Del Toral, Regulations Manager, Ground Water and Drinking Water Branch, to Thomas Poy, Chief Ground Water and Drinking Water Branch (June 24, 2015) (emphasis added).

### ix. Veolia and LAN Mislead the Public By Falsely Assuring Them The Water Was Safe.

147. Not only were LAN and Veolia hired for the express purpose of determining the cause of Flint's water problems and identifying the corrective measures necessary to render Flint's water system compliant with state and federal regulations, they were hired to give assurances to the residents that their water was, quite simply, safe to drink. LAN and Veolia complied with their mandate, and provided assurances that the water was safe to drink--when it was not.

### B. Factual Allegations Relating To Government Defendants[6]

### i. Background On Decision to Switch Water Sources

148. Plaintiff incorporates by reference and makes a part hereof all previous paragraphs as though they were fully set forth herein.

149. In 2011, Flint officials commissioned a study to determine if the Flint River could be safely used by the city as a primary source of drinking water. The "Analysis of the Flint River as a Permanent Supply for the City of Flint, July 2011" ("2011 Report"), prepared by Defendants Rowe and LAN, provided that Flint River water and the dormant Flint Water Treatment Plant ("WTP")

---

[6] The Term "Government Defendants" refers to the Former Emergency Managers.

could be used to supply water to the City, if millions of dollars were spent to upgrade the Flint WTP.

150. Use of the Flint River as a primary drinking source was rejected in 2011.

151. Throughout 2012, DWSD presented to Kurtz, Genesee County Drain Commissioner, Jeffrey Wright, Michigan Treasurer, Andy Dillon, Flint Mayor, Dayne Walling, and the Governor compelling arguments, based on numerous studies, demonstrating that from a cost and water reliability standpoint, Flint needed to reject Wright's pressure to join KWA and continue to receive water from DWSD.

152. Most, if not all, discourse about Flint joining KWA or continuing with DWSD, included Wright who consistently raised arguments designed to persuade Kurtz, Dillon and the Governor that the DWSD cost studies were wrong.

153. In late 2012, Dillon, reacting to Wright's contention that the DWSD cost studies were wrong, requested the independent engineering firm of Tucker, Young, Jackson and Tull ("TYJR") to assess whether it would be cost-effective for Flint to switch from water supplied by DWSD and join KWA water delivery system.

154. In February 2013, TYJR concluded that it would be more cost-effective for Flint on both a short term and long-term basis to continue to be supplied with water from DWSD.

155. Kurtz, Wright, Dillon, Walling, and the Governor understood that the decision to join KWA would result in Flint receiving water from the Flint River Flint for at least three years, until the city could be tied to the KWA.

156. On March 26, 2013 Busch wrote an email to Wyant, which outlined the health risks posed by switching to the Flint River as a water source. The email stated in part that switch would "pose an increased microbial risk to public health and pose an increased risk of disinfection by-product."

157. On March 26, 2013 Wyant wrote an email to Dillon, which stated, "all indications are that we are supportive of joining KWA and using Flint's water as opposed to the DWSD."

158. On March 28, 2013, Michigan's new Emergency Manager Law, Public Act 436 of 2012, took effect.

159. On March 29, 2013, Kurtz enacted a resolution to join KWA, and asked Dillion to approve the resolution.

160. On April 11, 2013, Dillon, in what is now understood to be a non-fiscal decision, authorized Kurtz to enter into a contractual relationship with KWA

for the purpose of supplying water to Flint beginning in mid-year 2016, subject to getting a last best offer from DWSD.

161. On April 15, 2013, DWSD provided a best and final offer to the City, representing a 20% savings as compared to the KWA proposal.

162. On April 16, 2013, Kurtz signed an agreement with KWA and informed Dillon that the City will join KWA.

163. DWSD Director, Sue McCormick, sent a letter to Flint on April 24, 2013 offering new DWSD rates that would save Flint $900 million dollars over 25 years.

164. In or around June 2013, the City of Flint hired LAN to advise Flint about the use of the Flint River as the City's primary water source during the construction of the new KWA treatment plant, which was projected to take approximately two years.

165. Although Flint recognized that water from the Flint River "would be more difficult to treat," the City concluded, based in part on LAN's recommendations, that the Flint River was "viable as a source" of public water.

166. On June 26, 2013, the City entered into a Resolution to switch over to the Flint River in April of 2014, and authorized action to prepare the WTP in anticipation of using the Flint water as the primary water source.

167. Later, the City hired LAN to place the WTP into full-time operation using the Flint River as a primary drinking water source.

168. LAN continued to advise Flint about its transition to Flint River water through 2015, and ultimately was paid more than $3.8 million for its services.

169. In June 2013, Dillon Kurtz, Wright, and Walling developed an interim plan ("Interim Plan") to use the Flint River water before KWA became operational. The Interim Plan would cover 2.5 years (April 25, 2014 until approximately October 2016).

170. Kurtz knew that in 2011 the Flint River was professionally evaluated and rejected as a drinking source and that upgrades for the Flint WTP would cost millions.

171. In May 2013, Emergency Manager Kurtz announced his resignation effective July 2013. The governor reappointed Michael Brown as Flint's Emergency Manager.

172. In September 2013, after Emergency Manager Brown resigned, Darnell Earley was appointed by the Governor as Flint's Emergency Manager.

173. At the time of the switch to the Flint River Former Emergency Earley had direct knowledge that the Flint Water Treatment Plant required significant physical upgrades and improvements before the Flint River could be used as

a temporary water source for the citizens of Flint as he consistently reported to the Michigan State Treasurer and Governor on November 21, 2013, April 8, 2014, and July 8, 2014:

    **a. Upgrades to the City's Water Treatment Plant are required prior to the transition** to the KWA water source ***and any temporary use of the Flint River***. KWA water from Lake Huron will be "raw" and **will require treatment** by the city **prior to customer distribution**. **November 21, 2013**

    **b. Upgrades to the City's Water Treatment Plant are required prior to the transition** to the KWA water source ***and any temporary use of the Flint River***. KWA water from Lake Huron will be "raw" and **will require treatment** by the city **prior to customer distribution. April 8, 2014.**

174. Michael Glasgow, the City of Flint's water treatment plant's laboratory and water quality supervisor informed the MDEQ on April 16, 2014, that the WTP was not fit to begin operations and that "management" was not listening to him because "they seem to have their own agenda."

175. On April 25, 2014, under the direction of Earley, Flint water users began receiving Flint River water from their taps even though Glasgow warned that the WTP was not ready.

176. No corrosion control was put in place prior to, April 25, 2014.

177. On July 8, 2014 Earley reported to the Michigan State Treasurer and the Governor:

a. **Upgrades to the City's Water Treatment Plant are required prior to the transition** to the KWA water source *__and any temporary use of the Flint River__*. KWA water from Lake Huron will be "raw" and **will require treatment** by the city **prior to customer distribution**. **July 8, 2014.**

178. In the summer of 2014, reported incidents of legionnaires' disease were on the rise in the Flint area, ultimately resulting in 10 deaths in 18 months.

179. Legionnaires' disease is associated with biofilms and corrosion in piping systems, and water with a pH range of 5.0 to 8.5, conditions which were all present in the Flint water supply. In addition to lead, Defendants' conduct also caused other harmful toxins to enter Plaintiffs' water supply.

180. By October 2014, the increased threat of deadly legionnaires' disease was adding to the public health safety crisis.

181. After seven months of exposure to elevated TTHM levels, in January 2015, Flint water users belatedly received a notice stating that the water was not in compliance with the Federal Safe Drinking Water Act due to unlawful levels of TTHMs.

182. In January 2015, within a few weeks of the issuance of the TTHM notice, Flint City Council members and Flint citizens, outraged over the poor water quality approached Earley, and demanded that Flint reconnect with Detroit water. Earley refused.

183. Earley resigned as Flint's Emergency Manager on January 13, 2015.

184. Ambrose was appointed Flint's Emergency manager on January 15, 2013.

185. On or about January 29, 2015, DWSD offered Ambrose another opportunity to use Detroit water and protect Plaintiffs from known dangers of the toxic water; however, Ambrose rejected this offer.

186. In February 2015 nationally recognized expert, Janet Stout, PhD offered to personally perform Legionella testing in Flint at no cost. No Legionella testing was performed.

187. In August 2015 Legionella testing was performed at hospitals and other locations in the City and evidence of Legionella was found at various locations through the Flint Community water system.

188. Legionella is a relatively common, naturally occurring waterborne bacterium.

189. Legionella is a normal part of the ecology of water distribution systems. It is commonly understood that Legionella enters building plumbing systems through municipal water distribution systems.

190. Legionella growth occurs when favorable conditions exist. Conditions favorable to growth include increased water temperature, increased availability of nutrients, presence of other microbes (bacteria and protozoa) and reduced levels of residual disinfectant.

191. For disease transmission to occur from a building water system, the building water system must be colonized by disease-causing Legionella bacteria; Legionella must grow; the water carrying amplified levels of Legionella must be aerosolized and then inhaled or aspirated by a person who has a particular susceptibility to infection.

192. The documented conditions in the Flint municipal water distribution system after the source water change indicate that the source water change and the management strategies that followed significantly increased conditions favorable to the dispersion and amplification of Legionella throughout Flint, leading to the increase in the incidence of Legionnaire's disease in Genesee County in 2014 and 2015.

193. The documented conditions included extensive corrosion and scaling; increased frequency of water main breaks and leaks; increased water temperatures; increased amounts of organic material and sediment; multiple boil water advisories due to elevated levels of fecal coliform bacteria; multiple reported brown water events; rapid dissipation of residual disinfectant levels due to high organic demand, reflected by low levels of residual disinfectant and increased levels of total Trihalomethanes; multiple water service interruptions and changes in water pressure associated with water main breaks.

194. From available data Legionella was prevalent throughout the Flint municipal water distribution system in 2015 and 2016 when the treatment plant water was drawn from the Flint River.

195. In 2016 Legionella bacteria was detected in 12% of randomly selected homes in Flint that were connected to the Flint municipal water distribution system.

## NOTICE UNDER MCL § 600.6431

196. Plaintiff incorporates by reference and make a part hereof all previous paragraphs as though they were fully set forth herein.

197. Plaintiff gave notice to Kurtz, Earley, and Ambrose on March 21, 2017 of his intention to file claims against them. *See* **Exhibit 1 – Notice of Intention to File Claims.**

## NOTICE UNDER MCL § 691.1406

198. Plaintiff incorporates by reference and make a part hereof all previous paragraphs as though they were fully set forth herein.

199. Plaintiff gave notice to the City on March 21, 2017 of his intention to file claims against it under MCL § 691.1406 for its breach of its duty to repair and maintain public buildings under their control which were open for use by members of the public, which caused injury to Plaintiff. *Id.*

# CAUSES OF ACTION

## COUNT I: Professional Negligence and Negligence –
## Private Engineering Defendants

200.  Plaintiff incorporates by reference and make a part hereof all previous paragraphs as though they were fully set forth herein.

201.  Veolia, LAN, and Rowe ("Private Engineering Defendants") undertook, for substantial consideration, to render services for the City of Flint which each should have recognized as necessary for the protection of Plaintiff. Furthermore, Veolia, LAN, and Rowe reasonably could and should have foreseen that the failure to exercise ordinary care and the failure to satisfy the standard of reasonable engineering professionals in performing those services would endanger Plaintiff.

202.  Private Engineering Defendants owed Plaintiff a duty to exercise ordinary care in order to avoid harm to persons and property in the execution of their undertakings.

203.  As professional engineers, Private Engineering Defendants owed Plaintiff a duty that other engineers of ordinary learning, judgment, or skill would provide in said situations.

204.  Plaintiff relied on Veolia to perform the duty to inspect the City's water supply to ensure that it was safe.

205. Veolia failed to undertake reasonable care and conduct as a professional engineering firm.

206. Veolia failed to exercise reasonable care in inspecting the City's water system and issuing its interim and final reports.

207. Veolia failed to exercise reasonable care when it declared that Flint's drinking water met federal and/or state and/or all applicable requirements.

208. Veolia failed to exercise reasonable care when it represented to the Flint community and others that Flint's drinking water was safe.

209. Veolia failed to exercise reasonable care when it discounted the possibility that problems with Flint's water supply were causing harms.

210. Veolia failed to exercise reasonable care when it failed to warn about the dangers of lead leaching into Flint's water system.

211. Veolia failed to exercise reasonable care when it did not recommend the immediate implementation of corrosion control for purposes of preventing lead contamination in Flint's water supply.

212. Plaintiff relied on LAN and Rowe to perform the duty to ensure proper treatment of the new water source(s).

213. LAN and Rowe failed to exercise reasonable care and conduct as professional engineering firms.

214. LAN and Rowe failed to exercise reasonable care in preparing for and executing the transition from treated DWSD water to untreated Flint River water.

215. LAN and Rowe failed to exercise reasonable care when they failed to implement corrosion control in a system containing lead pipes that was being transitioned onto a highly corrosive water source.

216. Under the same or similar circumstances, a professional engineering firm of ordinary learning, judgment or skill would not engage in the Engineering Defendants' above- described conduct.

217. Private Engineering Defendants' failures to exercise ordinary, reasonable care and failures to satisfy the standards of reasonable engineering professionals proximately caused Plaintiff's injuries and harms, which were entirely foreseeable.

218. As a direct and proximate result of Private Engineering Defendants' negligence, Plaintiff has suffered and continues to suffer harms to his person.

## **COUNT II**: Intentional Infliction of Emotion Distress – Kurtz, Earley, and Ambrose

219. Plaintiff incorporates by reference and make a part hereof all previous paragraphs as though they were fully set forth herein.

220. As State Appointed Emergency Managers, Kurtz, Earley, and Ambrose were ministerial officers charged with the duty to follow and perform functions consistent with their responsibilities under MCL § 141.1541 *et. seq.* the Local Financial Stability and Choice Act.

221. With malicious intent, willful misconduct, and/or a wanton or reckless disregard and concern for whether injury would result, Kurtz, Earley, and Ambrose acted dishonestly and in bad faith in failing to properly discharge the duties described above. Instead, Kurtz, Earley, and Ambrose, intentionally concealed information and mislead the public and other government agencies about the presence of lead and other toxic substances in the Flint water supply.

222. Emergency Manager Defendants' outrageous misconduct in causing, prolonging, and obscuring Plaintiff's exposure to toxic, contaminated water exceeds all bounds of decency in a civilized society.

223. Defendants Kurtz, Earley, and Ambrose, conduct caused personal injury and severe emotional distress to Plaintiff.

224. Defendants Kurtz, Earley, and Ambrose, conduct was the proximate cause of Plaintiff's injuries.

225. As a direct and proximate result of the Emergency Manager Defendants' bad faith, intentional conduct, and/or failure to act, Plaintiff has suffered past, present, and future personal injuries, including but not limited to: health problems, physical pain and suffering, loss of quality of life, unreasonable interference with all aspects of daily living, quality of life, mental anguish, emotional distress, humiliation, medical expenses, as well as exemplary damages.

## COUNT III: Negligent Infliction of Emotional Distress – Kurtz, Earley, Ambrose and Private Engineering Defendants

226. Plaintiff incorporates by reference and make a part hereof all previous paragraphs as though they were fully set forth herein.

227. Emergency Manager Defendants and Private Engineering Defendants were in a special relationship to Plaintiff, being persons and entities entrusted with the protection of the City's water delivery system.

228. With a substantial lack of concern for whether injuries would result, Emergency Manager Defendants and Private Engineering Defendants inflicted emotional distress and mental anguish on Plaintiff through, among other things, the following extreme, outrageous and shocking behavior:

a. Inflicting physical danger, battery, disease and illness for no acceptable purpose;
b. Disseminating lies and falsehoods as set forth, in detail above;
c. Concealing and covering up the true status of the contamination and attendant health risks, as set forth in detail above.

229. Emergency Manager Defendants and Private Engineering Defendants placed Plaintiff in a zone of physical danger, causing him severe emotional distress and mental anguish.

230. Defendants named, within this count's grossly negligent acts were the proximate cause of Plaintiff's and the Class's severe emotional distress and mental anguish related to his exposure to Legionella bacteria.

231. The physical harm, distress and mental anguish caused by Defendants Kurtz, Earley, Ambrose, and Private Engineering Defendants to Plaintiff was highly foreseeable.

232. As a direct and proximate result of the above-named Defendants' conduct and/or failures to act, Plaintiff has suffered and continue to suffer harms.

### **COUNT IV: Negligence – Defective Building – City**

233. Plaintiff incorporates by reference and make a part hereof all previous paragraphs as though they were fully set forth herein.

234. At all times, relevant hereto the City was the owner of the Flint WTP. A building that was under its control and open for use by members of the public.

235. The City had a duty to repair and maintain public buildings under their control, which were open for use by members of the public.

236. The City, through its agents, had actual or constructive knowledge of the danger to the Flint Water Customers in general, and Plaintiff in particular, but failed to install the necessary equipment in the Flint Water Treatment Plant for the safe processing of Flint River water as the primary drinking water source for Flint water customers between April 25, 2014 and December 6, 2016.

237. The City further maintained, operated and controlled the Flint WTP and its fixtures, including but not limited to the equipment, piping, physical plant, building structure, pumps, water treatment, mechanical and electrical systems in a dangerous and defective manner, with actual or constructive knowledge of its dangerous and defective condition, and failed to take reasonable steps to protect the public in general, and Plaintiff in particular, from the above-described conditions.

238. As a direct and proximate result, Plaintiff contracted Legionnaire's disease for which he was hospitalized on December 6, 2016 for six (6) days of

treatment, which have resulted in permanent pulmonary injuries to Joel V. Dennis Lee.

239. Said injuries to Plaintiff include, but are not limited to, lost wages, medical expenses not covered by insurance, physical and emotional damages and pain and suffering.

## <u>COUNT V</u>: Substantive Due Process – Bodily Integrity – Kurtz, Earley, and Ambrose

240. Plaintiff incorporates by reference and make a part hereof all previous paragraphs as though they were fully set forth herein.

241. Plaintiff has a clearly established fundamental right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to bodily integrity.

242. Emergency Manager Defendants' conduct, while acting under color of law, endangered and/or threatened Plaintiff's fundamental liberty interest to bodily integrity as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

243. Emergency Manager Defendants were aware that their conduct could result in the deprivation of Plaintiff's fundamental due process rights to bodily integrity.

244. Emergency Manager Defendants deliberately and knowingly breached the constitutionally protected bodily integrity of Plaintiff by creating and

perpetuating the ongoing exposure to contaminated water, with deliberate indifference to the known risks of harm which said exposure would, and did, cause to Plaintiff in violation of 42 U.S.C. § 1983.

245. Individual Government Defendants had the opportunity to reflect and deliberate before they acted and/or failed to act.

246. As a direct and proximate result of Emergency Manager Defendants' unconstitutional acts as alleged in this Complaint, Plaintiff has suffered, and continues to suffer, violation of his fundamental right to bodily integrity, and liberty interests, including, but not limited to:

   a. Serious and in some cases life threatening and irreversible bodily injury;
   b. Substantial economic losses from medical expenses, lost wages, and lost income;
   c. Pain and suffering;
   d. Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

247. This Count is brought against Defendants Kurtz, Earley, and Ambrose in both their individual and official capacities.

248. With respect to Defendants Kurtz, Earley, and Ambrose sued in their individual capacities, Emergency Manager Defendants conduct was so reckless and outrageous that it entitles Plaintiff to punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays as follows:

A. That judgment be entered for Plaintiff against all Defendants for damages sustained as a direct and proximate cause of Defendants' conduct. Said judgment should encompass compensatory damages for his actual physical injuries, pain and   suffering, emotional distress, embarrassment, and reimbursement for medical expenses, lost wages, and other out   of pocket expenses associated with his injuries.
B. Plaintiff should further recover pre-judgment and post-judgment interest as permitted by law.
C. That Plaintiff recover his attorney fees and costs of this lawsuit as permitted by law.
D. Any other such relief as is just and proper under the circumstances.


Dated: May 31, 2017                    Respectfully Submitted,

VALDEMAR L. WASHINGTON, PLLC

*/s/ Valdemar L. Washington P-27165*
Attorney for Plaintiff
718 Beach Street/P.O. Box 187
Flint, MI 48501-0187
810.407.6868
vlwlegal@aol.com

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure Plaintiff herewith makes Demand for Trial by Jury in this cause.

Dated: May 31, 2017                    Respectfully Submitted,

VALDEMAR L. WASHINGTON, PLLC

*/s/ Valdemar L. Washington P-27165*
Attorney for Plaintiffs
718 Beach Street/P.O. Box 187
Flint, MI 48501-0187
810.407.6868
vlwlegal@aol.com